UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



___ CIV. ___ (__)

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

**COMPLAINT**

 Plaintiff,

**JURY TRIAL DEMANDED**

-against-



CITIGROUP, INC.; CITIGROUP
MORTGAGE LOAN TRUST, INC.;
CITIGROUP GLOBAL MARKETS, INC.;
CITIGROUP GLOBAL MARKETS REALTY
CORP.; SUSAN MILLS; RANDALL
COSTA; SCOTT FREIDENRICH; RICHARD
A. ISENBERG; MARK I. TSESARSKY;
PETER PATRICOLA; JEFFREY
PERLOWITZ; and EVELYN ECHEVARRIA,

Defendants.

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................1

PARTIES ..................................................................................................................6

JURISDICTION AND VENUE ................................................................................9

FACTUAL ALLEGATIONS ...................................................................................10

I.      THE SECURITIZATIONS.............................................................................10

        A.      Residential Mortgage-Backed Securitizations In General.....................10

        B.      The Securitizations At Issue In This Case .............................................12

        C.      The Securitization Process.....................................................................12

                1.      CGMR Pools Mortgage Loans In Special Purpose Trusts........12

                2.      The Trusts Issue Securities Backed By The Loans....................13

II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION
        PROCESS ......................................................................................................16

        A.      The Role Of Each Of The Defendants...................................................16

                1.      CGMR..................................................................................17

                2.      CGMLT.................................................................................18

                3.      CGMI....................................................................................18

                4.      Citi.......................................................................................19

                5.      The Individual Defendants......................................................20

        B.      Defendants' Failure To Conduct Proper Due Diligence.........................25

III.    THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS .........30

A.        Compliance With Underwriting Guidelines ........................................................30

B.        Statements Regarding Occupancy Status Of Borrower .........................................33

C.        Statements Regarding Loan-To-Value Ratios ......................................................35

D.        Statements Regarding Credit Ratings ...................................................................37

IV.     FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS ....................................................................................39

A.        The Statistical Data Provided In The Prospectus Supplements Concerning Owner Occupancy And LTV Ratios Was Materially False...................................39

        1.       Owner Occupancy Data Was Materially False .........................................40

        2.       Loan-To-Value Data Was Materially False ...............................................42

B.        The Originators Of The Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines .......................................................45

        1.       Government Investigations Have Confirmed That The Originators Of The Loans In The Securitizations Systematically Failed To Adhere To Their Underwriting Guidelines.................................................45

                i.      Wells Fargo.....................................................................................46

                ii.     Countrywide....................................................................................49

                iii.    American Home ..............................................................................50

                iv.    Argent .............................................................................................52

                v.      WMC................................................................................................54

                vi.    Inflated Appraisals .........................................................................55

        2.       The Collapse Of The Certificates' Credit Ratings Further Indicates That The Mortgage Loans Were Not Originated In Adherence To The Stated Underwriting Guidelines .......................................................56

    3.    The Surge In Mortgage Delinquencies And Defaults Further Indicates That The Mortgage Loans Were Not Originated In Adherence To The Stated Underwriting Guidelines..................................58

V.    FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES .................................................59

FIRST CAUSE OF ACTION .................................................................................61

SECOND CAUSE OF ACTION ............................................................................64

THIRD CAUSE OF ACTION ................................................................................68

FOURTH CAUSE OF ACTION ............................................................................72

FIFTH CAUSE OF ACTION .................................................................................75

SIXTH CAUSE OF ACTION .................................................................................78

SEVENTH CAUSE OF ACTION ..........................................................................82

EIGHTH CAUSE OF ACTION .............................................................................85

PRAYER FOR RELIEF ........................................................................................89

JURY TRIAL DEMANDED .................................................................................90

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against Citigroup, Inc. ("Citi"), Citigroup Mortgage Loan Trust, Inc. ("CGMLT"), Citigroup Global Markets, Inc. ("CGMI"), Citigroup Global Markets Realty Corp. ("CGMR") (collectively, the "Citi Defendants"), Susan Mills, Randall Costa, Richard A. Isenberg, Scott Freidenrich, Mark I. Tsesarsky, Peter Patricola, Jeffrey Perlowitz, and Evelyn Echevarria (the "Individual Defendants") (together with the Citi Defendants, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.      This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions.  Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers' to repay their mortgage loans.  These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*., Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and constitutes common law negligent misrepresentation.

2.      Between September 13, 2005 and May 31, 2007, Fannie Mae and Freddie Mac purchased over $3.5 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with ten securitizations sponsored or underwritten by the Citi Defendants.[1] The GSE Certificates purchased by Freddie Mac, along with date and amount of the purchases, are listed *infra* in Table 10.  The GSE Certificates purchased by Fannie Mae, along with date and amount of the purchases, are listed *infra* in Table 11.  The following ten securitizations are at issue in this case:

    i.      Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W2 ("ARSI 2005-W2");

    ii.     CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-7 ("CMLTI 2005-7");

    iii.    CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-10 ("CMLTI 2005-10");

    iv.     CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-HE3 ("CMLTI 2005-HE3");

    v.      CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-HE4 ("CMLTI 2005-HE4");

    vi.     CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-AR2 ("CMLTI 2006-AR2");

    vii.    CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-

---

[1]  For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2 below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

AR5 ("CMLTI 2006-AR5");

viii.   CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-
        WF1 ("CMLTI 2006-WF1");

ix.    CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-
        WF2 ("CMLTI 2006-WF2");

x.     CitiGroup Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-
        AR7 ("CMLTI 2007-AR7"); and

 (collectively, the "Securitizations").

3.      The Certificates were offered for sale pursuant to one of five shelf registration

statements (the "Shelf Registration Statements") filed with the Securities and Exchange

Commission (the "SEC").  Defendant CGMLT filed four Shelf Registration Statements that

pertained to nine of the Securitizations at issue in this action.  The Individual Defendants signed

one or more of the Shelf Registration Statements and the amendments thereto.  With respect to

all of the Securitizations, CGMI was the lead underwriter, and with respect to all but one of the

Securitizations, CGMI was also the underwriter who sold the Certificates to the GSEs.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement

("Prospectus Supplement") were filed with the SEC as part of the Shelf Registration Statement

for that Securitization.[2]  The GSE Certificates were marketed and sold to Fannie Mae and

Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements

and the corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the characteristics and

---

[2]  The term "Registration Statement," as used herein, incorporates the Shelf Registration
statement, the Prospectus and the Prospectus Supplement for each referenced Securitization,
except where otherwise indicated.

credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the

borrowers of those underlying mortgage loans, and the origination and underwriting practices

used to make and approve the loans.  Such statements were material to a reasonable investor's

decision to purchase the Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these

statements were materially false, as significant percentages of the underlying mortgage loans

were not originated in accordance with the stated underwriting standards and origination

practices and had materially poorer credit quality than what was represented in the Registration

Statements.

6.     The Registration Statements contained statistical summaries of the groups of

mortgage loans in each Securitization, such as the percentage of loans secured by owner-

occupied properties and the percentage of the loan group's aggregate principal balance with

loan-to-value ratios within specified ranges.  This information was also material to reasonable

investors.  However, a loan level analysis for each Securitization—an analysis that encompassed

a statistically significant sample of thousands of mortgages across all of the Securitizations—has

revealed that these statistics were also false and omitted material facts due to inflated property

values and misstatements of other key characteristics of the mortgage loans.

7.     For example, the percentage of owner-occupied properties is a material risk factor

to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who

lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more

likely to take better care of the property.  The loan level review reveals that the true percentage

of owner-occupied properties for the loans supporting the GSE Certificates was materially lower

than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements

misrepresented other material factors, including the true value of the mortgaged properties

4

relative to the amount of the underlying loans.

8.      Defendants CGMLT (the depositor for nine of the Securitizations), CGMI (the lead underwriter for all of the Securitizations and selling underwriter for nine of the Securitizations), and the Individual Defendants (the signatories to the Registration Statements with respect to nine of the Securitizations) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the GSE Certificates to Fannie Mae and Freddie Mac, and/or directed and controlled such activities.

9.      Defendants CGMR (the sponsor of nine of the Securitizations) and Citi are also responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants CGMLT and CGMI.  Citi also directly participated in and exercised dominion and control over the business operations of Defendants CGMLT, CGMR, and CGMI.

10.      Fannie Mae and Freddie Mac purchased over $3.5 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

11.      FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for

common law negligent misrepresentation.

## PARTIES

### *The Plaintiff and the GSEs*

12.     The Federal Housing Finance Agency is a federal agency located at 1700 G Street, NW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

13.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### *The Defendants*

14.     Defendant CitiGroup, Inc. is a diversified global financial services holding company, incorporated under the laws of the State of Delaware, and headquartered at 399 Park Avenue, New York, New York.  Citi offers a broad range of financial services to consumer and corporate customers, with more than 200 million customer accounts and operations in more than 100 countries.   All of the Citi Defendants are direct or indirect subsidiaries of Citi.

15.     Defendant CitiGroup Global Markets, Inc., formerly known as Salomon Smith Barney or Smith Barney, is a New York corporation with its principal place of business at 388 Greenwich St. in New York, New York.  CGMI is a registered broker-dealer with the SEC, and is a wholly owned subsidiary of Citi.  CGMI was the lead underwriter for each Securitization and was intimately involved in the offerings of the Certificates.  With one exception, Fannie Mae and Freddie Mac purchased all of the GSE Certificates from CGMI in its capacity as underwriter of the Securitizations.

16.     Defendant CitiGroup Mortgage Loan Trust, Inc. is a Delaware corporation with its principal place of business located at 390 Greenwich Street, 6th Floor, New York, New York 10013.  It is a wholly owned subsidiary of Citi.  It was the depositor for nine of the ten Securitizations, the registrant for certain Registration Statements filed with the SEC, and an issuer of certain Certificates purchased by the GSEs.

17.     Defendant Citigroup Global Markets Realty Corp. is a New York corporation with its principal place of business at 390 Greenwich St. in New York, New York.  It is an affiliate of CGMI, a wholly owned subsidiary of Citi.  CGMR was the sponsor of nine of the ten Securitizations.[3]

18.     Defendant Susan Mills is an individual residing in Rockville Centre, New York. Ms. Mills was Vice President and Managing Director of Defendant CGMLT.  Ms. Mills was also the head of CGMI's Mortgage Finance Group since 1999.  Ms. Mills signed the Shelf Registration Statements and the amendments thereto, and did so in New York.

19.     Defendant Richard A. Isenberg is an individual residing in New York, New York.

---

[3]  The remaining securitization was sponsored by non-party Ameriquest Mortgage Company.

Mr. Isenberg was a Director and President (Principal Executive Officer) of Defendant CGMLT. Mr. Isenberg signed certain Shelf Registration Statements and the amendments thereto, and did so in New York.

20.     Defendant Randall Costa is an individual residing in Evanston, Illinois.  Mr. Costa was a Director and President (Principal Executive Director) of Defendant CGMLT.  Mr. Costa signed certain Shelf Registration Statements and the amendments thereto, and did so in New York.

21.     Defendant Scott Freidenrich is an individual residing in Westfield, New Jersey. Mr. Freidenrich was a Treasurer (Principal Financial Officer) of Defendant CGMLT.  Mr. Freidenrich signed certain Shelf Registration Statements and the amendments thereto, and did so in New York.

22.     Defendant Mark I. Tsesarsky is an individual residing in New York, New York. Mr. Tsesarsky was a Director of Defendant CGMLT.  Mr. Tsesarsky signed certain Shelf Registration Statements and the amendments thereto, and did so in New York.

23.     Defendant Peter Patricola is an individual residing in Holmdel, New Jersey.  Mr. Patricola was a Controller of Defendant CGMLT.  Mr. Patricola signed certain Shelf Registration Statements and the amendments thereto, and did so in New York.

24.     Defendant Jeffrey Perlowitz is an individual residing in Short Hills, New Jersey. Mr. Perlowitz was a Director of Defendant CGMLT.  Mr. Perlowitz signed certain Shelf Registration Statements and the amendments thereto, and did so in New York.

25.     Defendant Evelyn Echevarria is an individual residing in Charlotte, North Carolina.  Ms. Echevarria was a Director of Defendant CGMLT.  Ms. Echevarria signed certain Registration Statements and the amendments thereto, and did so in New York.

*The Non-Party Originators:*

26.    CitiMortgage, Inc. ("CitiMortgage") is a Florida corporation with its principal place of business at 1000 Technology Drive, Mailstop 730, O'Fallon, Missouri.  It was engaged in the business of, among other things, originating and acquiring residential mortgage loans and selling those loans through securitizations.  It originated and serviced many of the residential mortgage loans at issue here.

27.    In addition, many of the loans underlying the Certificates were acquired by the sponsor for each Securitization from other non-party mortgage originators.  The originators responsible for the loans underlying the Certificates include Countrywide Home Loans, Inc. ("Countrywide"), Greenpoint Mortgage Funding, Inc., Quicken Loans, Inc., MortgageIT, Inc., Wells Fargo Bank, N.A. ("Wells Fargo"), WMC Mortgage Corp. ("WMC"), American Home Mortgage Corp. ("American Home"), and Argent Mortgage Company ("Argent"), among others.

## JURISDICTION AND VENUE

28.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie Mae and Freddie Mac.

29.    Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

30.    This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code pursuant to this Court's supplemental jurisdiction

under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claim of negligent misrepresentation pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

31.     Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Several of the Citi Defendants are principally located in this district, several of the Individual Defendants reside in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements occurred in substantial part in the State of New York.  Additionally, the GSE Certificates were actively marketed and sold from this State and several of the Defendants can be found and transact business in this District.  Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

## I.     THE SECURITIZATIONS

### A.     Residential Mortgage-Backed Securitizations In General

32.     Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

33.     The most common form of securitization of mortgage loans involves a sponsor or seller—the entity that acquires or originates the mortgage loans and initiates the securitization— and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is established pursuant to a Pooling and Servicing Agreement entered into by, among others, the "depositor" for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to

an intermediate entity, often a limited purpose entity created by the sponsor . . .  and commonly

called a depositor, and then the depositor will transfer the assets to the [trust] for the particular

asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518,

Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

34.     Residential mortgage-backed securities ("RMBS") are backed by the underlying

mortgage loans.  Some RMBS are created from more than one cohort of loans called collateral

groups, in which case the trust issues securities backed by different loan groups.  For example, a

securitization may involve two groups of mortgages, with some securities backed primarily by

the first group, and others primarily by the second group.  Purchasers of the securities acquire an

ownership interest in the assets of the trust, which in turn owns the loans.  The purchasers of the

securities receive the cash-flows from the designated mortgage groups, such as homeowners'

payments of principal and interest on the mortgage loans held by the related trust.

35.     RMBS are issued pursuant to registration statements filed with the SEC.  These

registration statements include prospectuses, which explain the general structure of the

investment, and prospectus supplements, which contain detailed descriptions of the mortgage

group underlying the certificates.  Certificates are issued by the trust pursuant to the registration

statement and the prospectus and prospectus supplement.  Underwriters sell the certificates to

investors.

36.     A mortgage servicer is necessary to manage the collection of proceeds from the

mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan

payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The

servicer's duties include making collection efforts on delinquent loans, initiating foreclosure

proceedings, and determining when to charge off a loan by writing down its balance.  The

servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

**B.      The Securitizations At Issue In This Case**

37.      This case involves the ten Securitizations listed in Table 1 below, nine of which were sponsored and structured by CGMR, and all of which were underwritten by CGMI.  For each of the ten Securitizations, Table 1 identifies the (1) sponsor; (2) depositor; (3) lead underwriter; (4) principal amount issued for the tranches purchased by the GSEs; (5) date of issuance; and (6) the loan group or groups backing the GSE Certificate for that Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Securitization | Tranche[4] | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued per Tranche ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| ARSI 2005-W2 | A1 | Ameriquest Mortgage Company | Argent Securities Inc. | CGMI | 1,351,319,000 | 9/27/2005 | Group I |
| CMLTI 2005-10 | IA3A | CGMR | CGMLT | CGMI | 151,768,000 | 12/ 30/2005 | Group I-3 |
| CMLTI 2005-7 | IA2 | CGMR | CGMLT | CGMI | 132,099,000 | 9/30/2005 | Group 1-2 |
| CMLTI 2005-HE3 | A1 | CGMR | CGMLT | CGMI | 380,972,000 | 9/13/2005 | Group I |
| CMLTI 2005-HE4 | A1 | CGMR | CGMLT | CGMI | 344,773,000 | 11/30/2005 | Group I |
| CMLTI 2006-AR2 | IA1 | CGMR | CGMLT | CGMI | 161,220,000 | 3/30/2006 | Group I-1 |
| CMLTI 2006-AR5 | 1A2A | CGMR | CGMLT | CGMI | 36,920,000 | 6/30/2006 | Group 1-2 |
| CMLTI 2006-WF1 | A1 | CGMR | CGMLT | CGMI | 425,206,000 | 3/30/2006 | Group I |
| CMLTI 2006-WF2 | A1 | CGMR | CGMLT | CGMI | 484,445,000 | 5/31/2006 | Group I |
| CMLTI 2007-AR7 | A2A | CGMR | CGMLT | CGMI | 117,893,000 | 5/31/2007 | Group 2 |

**C.      The Securitization Process**

**1.      CGMR Pools Mortgage Loans In Special Purpose Trusts**

38.      As the sponsor for nine of the ten Securitizations, Defendant CGMR purchased the mortgage loans underlying the Certificates for those nine Securitizations after the loans were

---

[4]   A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

originated, either directly from the originators or through affiliates of the originators, including

CitiMortgage.[5]

39.     CGMR then sold the mortgage loans for the nine Securitizations that it sponsored

to the depositor, Defendant CGMLT, a Citi-affiliated entity.  With respect to the remaining

securitization, a non-party sponsor sold the mortgage loans to a non-party depositor, as reflected

in Table 1, *supra* at paragraph 37.  Defendant CGMI was the lead or co-lead underwriter, and the

selling underwriter, for that securitization.

40.     CGMLT was a wholly-owned, limited-purpose financial subsidiary of Defendant

Citi.  The sole purpose of CGMLT as depositor was to act as a conduit through which loans

acquired by the sponsor could be securitized and sold to investors.

41.     As depositor for nine of the Securitizations, Defendant CGMLT transferred the

relevant mortgage loans to the trusts.  As part of each of the Securitizations, the trustee, on behalf

of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with the relevant

depositor and the parties responsible for monitoring and servicing the mortgage loans in that

Securitization.  The securitization trust, administered by the trustee, held the mortgage loans

pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by

such loans.

### 2.     The Trusts Issue Securities Backed By The Loans

42.     Once the mortgage loans were transferred to the trusts in accordance with the

PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates

were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an

---

[5]   Non-party sponsor Ameriquest Mortgage Company was a sponsor of the one non-Citi
sponsored Securitizations.  The sponsor for each Securitization is included in Table 1, *supra* at
paragraph 37.

ownership interest in the assets of the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cash-flows from the underlying mortgages in the Supporting Loan Group.  The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

43.     The Certificates were issued pursuant to one of the five Shelf Registration Statements, filed with the SEC on Form S-3.  Certain Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC.  Each Individual Defendant signed one or more of the four Shelf Registration Statements, including any amendments thereto, which were filed by CGMLT.  The SEC filing number, registrants, signatories, and filing dates for each Shelf Registration Statement and amendments thereto, as well as the Certificates covered by each Shelf Registration Statement, are reflected in Table 2 below.

## Table 2

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statements | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-124036 | 4/13/2005 | N/A | CGMLT | CMLTI 2005-HE3 | Susan Mills<br>Richard A. Isenberg<br>Scott Freidenrich<br>Peter Patricola<br>Mark I. Tsesarsky<br>Jeffrey Perlowitz<br>Evelyn Echevarria | N/A |
| 333-127834 | 8/25/2005 | 9/7/2005 | CGMLT | CMLTI 2005-7;<br>CMLTI 2005-10;<br>CMLTI 2005-HE4;<br>CMLTI 2006-WF1;<br>CMLTI 2006-AR2 | Susan Mills<br>Richard A. Isenberg<br>Scott Freidenrich<br>Peter Patricola<br>Mark I. Tsesarsky<br>Jeffrey Perlowitz<br>Evelyn Echevarria | Susan Mills<br>Richard A. Isenberg<br>Scott Freidenrich<br>Peter Patricola<br>Mark I. Tsesarsky<br>Jeffrey Perlowitz<br>Evelyn Echevarria |
| 333-131136 | 1/19/2006 | 2/28/2006;<br>3/30/2006;<br>4/5/2006 | CGMLT | CMLTI 2006-AR5;<br>CMLTI 2006-WF2 | Susan Mills<br>Randall Costa<br>Scott Freidenrich<br>Peter Patricola<br>Mark I. Tsesarsky<br>Jeffrey Perlowitz<br>Evelyn Echevarria | Susan Mills<br>Randall Costa<br>Scott Freidenrich<br>Peter Patricola<br>Mark I. Tsesarsky<br>Jeffrey Perlowitz<br>Evelyn Echevarria |
| 333- | 10/25/2006 | 11/17/2006; | CGMLT | CMLTI 2007- | Susan Mills | Susan Mills |

14

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statements | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 138237 | | 12/4/2006; 12/12/2006 | | AR7 | Randall Costa Scott Freidenrich Peter Patricola Mark I. Tsesarsky Jeffrey Perlowitz Evelyn Echevarria | Randall Costa Scott Freidenrich[6] Peter Patricola Mark I. Tsesarsky Jeffrey Perlowitz Evelyn Echevarria |
| 333-112237 | 1/27/2004 | N/A | Argent Securities Inc. | ARSI 2005-W2 | Adam J. Bass John P. Grazer Andrew L. Stidd | N/A |

44.     The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide detailed and accurate information regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

45.     The Prospectus Supplements associated with each Securitization were filed with the SEC as part of the Registration Statements.  The Forms 8-K attaching the PSAs for each Securitization were also filed with the SEC.  The date on which the Prospectus Supplement and Form 8-K was filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

---

[6]   Scott Freidenrich did not sign the 11/17/2006 amendment to the Shelf Registration Statement.

**Table 3**

| Transaction | Date Prospectus Supplement Filed | Date of Filing Form 8-K Attaching PSA Filed | Filing No. of Related Registration Statement |
|---|---|---|---|
| ARSI 2005-W2 | 9/28/05 | 10/12/2005 | 333-112237 |
| CMLTI 2005-10 | 12/30/2005 | 3/22/2006 | 333-127834 |
| CMLTI 2005-7 | 10/3/2005 | 10/19/2005 | 333-127834 |
| CMLTI 2005-HE3 | 9/13/2005 | 9/28/2005 | 333-124036 |
| CMLTI 2005-HE4 | 11/29/2005 | 12/15/2005 | 333-127834 |
| CMLTI 2006-AR2 | 3/30/2006 | 5/1/2006 | 333-127834 |
| CMLTI 2006-AR5 | 6/30/2006 | 7/31/2006 | 333-131136 |
| CMLTI 2006-WF1 | 3/27/2006 | 4/18/2006 | 333-127834 |
| CMLTI 2006-WF2 | 5/25/2006 | 6/20/2006 | 333-131136 |
| CMLTI 2007-AR7 | 6/1/2007 | 10/2/2007 | 333-138237 |

46.     The Certificates were issued pursuant to the PSAs, and Defendant CGMI offered and sold the Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.

## II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS

### A.     The Role Of Each Of The Defendants

47.     Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates, which included purchasing the mortgage loans from the originators, structuring and arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

48.     With respect to each Securitization, the depositor, underwriters, and the Individual Defendants who signed the Registration Statements, as well as the Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statements, and omitting material facts

16

required to be stated therein or necessary to make the statements contained therein not misleading.

### 1. CGMR

49.     Defendant CGMR was organized in 1979 and has been securitizing residential mortgage loans since 1987. CGMR is an affiliate of CGMI, and acted as the sponsor of nine of the Securitizations. CGMR is a leading sponsor of mortgage-backed securities. As stated in the Prospectus Supplement for the CMLTI 2007-AR7 Securitization, during the 2003, 2004, 2005, and 2006 fiscal years, CGMR securitized approximately $2.9 billion, $7.1 billion, $18.4 billion, and $21 billion of mortgage loans, respectively.

50.     CGMR was the sponsor of nine of the ten Securitizations. In that capacity, CGMR determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined the distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates. For nine of the Securitizations, Defendant CGMR also selected CGMLT as the special purpose vehicle that would be used to transfer the mortgage loans from CGMR to the trusts, and selected CGMI as the underwriter for the Securitizations. In its role as sponsor, CGMR knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

51.     For the nine Securitizations that it sponsored, CGMR also conveyed the mortgage loans to CGMLT pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement. In these agreements, CGMR made certain representations and warranties to CGMLT regarding the groups of loans collateralizing the Certificates. These representations

and warranties were assigned by CGMLT to the trustees for the benefit of the Certificateholders.

### 2.   CGMLT

52.     Defendant CGMLT is engaged in the securitization of mortgage loans as a depositor.  It is a special purpose entity formed for the sole purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

53.     Defendant CGMLT was the depositor for nine of the ten Securitizations.  In its capacity as depositor, CGMLT purchased the mortgage loans from CGMR (as sponsor) pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable.  CGMLT then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  CGMLT, together with the other Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.   CGMI

54.     Defendant CGMI, formerly known as Salomon Smith Barney, was founded in 1910 and acquired by Travelers Group in 1998, which subsequently merged with Citi that year. Defendant CGMI is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the leading underwriters of mortgage- and other asset-backed securities in the United States.  CGMI was Citi's private label securities arm, specializing in "nonconforming and alternative pools" of loans.  Mortgage Banking Magazine, *CitiMortgage on the Move*, December

2006.

55.     Defendant CGMI was the lead underwriter for the Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors, with the exception of the CMLTI 2006-AR2 Securitization, which was sold to the GSEs by non-party UBS Securities, LLC.  CGMI was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred and underwritten.

### 4.     Citi

56.     Defendant Citi wholly owns its subsidiaries CGMLT, CGMI, CGMR, and CitiMortgage.  Unlike typical arms-length securitizations, the Securitizations here involved various Citi subsidiaries and affiliates at virtually each step in the chain.  With respect to over two-thirds of the Securitizations, the sponsor was CGMR, the depositor was CGMLT, the master servicer was CitiMortgage, and the lead underwriter was CGMI.  As for the remaining deals, with the exception of CMLTI 2006-AR2, CGMI was the lead and selling underwriter.

57.     As the sole corporate parent of CGMI, CGMLT, and CGMR, Citi had the practical ability to direct and control the actions of CGMI, CGMLT, and CGMR related to the Securitizations, and in fact exercised such direction and control over the activities of CGMR, CGMLT, CitiMortgage, and CGMI related to the issuance and sale of the Certificates.

58.     Citi, through its subsidiaries CGMI, CGMLT, CGMR, and CitiMortgage, was deeply involved in the RMBS market.  Citi expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and

omissions of material facts in the Registration Statements.

59.     From 2002 to 2005, Citi experienced intense growth in its residential mortgage business, doubling its origination business from $73 billion in 2002 to nearly $140 billion in 2005.  Mortgage Banking Magazine, *CitiMortgage on the Move*, December 2006.  The growth was even more striking at the subprime level.  From 2005 to 2007, Citi issued at least $26.3 billion in subprime loans.  Center for Public Integrity, *The Subprime 25*.  Such massive quantities of loans were the result of rapid and uncontrolled growth.  In 2006, Citi's subprime lending increased by 85%, to a total of $38 billion.  Mortgage Banking Magazine*, Inside the Market Correction*, May 2007.

60.     As detailed above, the Securitizations here involved Citi entities, including the aforementioned subsidiaries, at virtually each step in the process.  Citi profited substantially from this vertically integrated approach to mortgage backed securitization.  Furthermore, Citi shares, and, on information and belief, shared, overlapping management with the other Citi Defendant entities.  For instance, Defendant Susan Mills was Vice President and Managing Director of Defendant CGMLT, and signed four Shelf Registration Statements on behalf of CGMLT; she is also the head of CGMI's Mortgage Finance Group.

### 5.     The Individual Defendants

61.     Defendant Susan Mills was the Vice President and then Managing Director of Defendant CGMLT.  Under one of these two capacities, she signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005;

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005;

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006, March 30, 2006, and April 5, 2006; and

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

62.    Defendant Richard A. Isenberg was a Director and President (Principal Executive Officer) of Defendant CGMLT.  In that capacity, he signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005; and

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005.

63.    Defendant Randall Costa was a Director and President (Principal Executive Officer) of Defendant CGMLT.  In that capacity, he signed the following Registration Statements:

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006,  March 30, 2006, and April 5, 2006; and

21

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

64.    Defendant Scott Freidenrich was a Treasurer (Principal Financial Officer) of Defendant CGMLT.  In that capacity, he signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005;

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005;

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006,  March 30, 2006, and April 5, 2006; and

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

65.    Defendant Mark I. Tsesarsky was a Director of Defendant CGMLT.  In that capacity, he signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005;

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005;

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006,  March 30, 2006, and April 5, 2006; and

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

66.    Defendant Peter Patricola was a Controller of Defendant CGMLT.  In that capacity, he signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005;

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005;

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006,  March 30, 2006, and April 5, 2006; and

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

67.    Defendant Jeffrey Perlowitz was a Director of Defendant CGMLT.  In that capacity, he signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005;

23

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005;

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006, March 30, 2006, and April 5, 2006; and

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

68.     Defendant Evelyn Echevarria was a Director of Defendant CGMLT.  In that capacity, she signed the following Registration Statements:

- Registration Statement under file number 333-124036, filed with the SEC on April 13, 2005.

- Registration Statement under file number 333-127834, filed with the SEC on August 25, 2005, and the related amendments on form S-3/A on or about September 7, 2005;

- Registration Statement under file number 333-131136, filed with the SEC on January 19, 2006, and the related amendments on form S-3/A on or about February 28, 2006,  March 30, 2006, and April 5, 2006; and

- Registration Statement under file number 333-138237, filed with the SEC on October 25, 2006, and the related amendments on form S-3/A on or about November 17, 2006, December 4, 2006, and December 12, 2006.

**B.    Defendants' Failure To Conduct Proper Due Diligence**

69.    The Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

70.    During the time period in which the Certificates were issued—approximately 2005 through 2007—Citi's involvement in the mortgage-backed securitization market was rapidly expanding.  In an effort to increase revenue and profits, Citi vastly expanded the volume of mortgage-backed securities it issued as compared to prior years.  From 2003 to 2004, the volume of mortgage loans that CGMR securitized more than doubled to $7.1 billion.  In 2005, the volume again more than doubled from $7.1 billion to $18.4 billion.  In 2006, CGMR securitized its largest volume of mortgage loans – $21.5 billion.  CGMR's growth in subprime loans was particularly astronomical.  CGMR issued $300 million in subprime loans in 2003.  By 2004, that number increased *eight-fold* to $2.4 billion, and then nearly *quadrupled* again in 2005 to $8.2 billion.  By 2006, CGMR had securitized its largest volume of subprime loans, over $10.3 billion.  *See* CMLTI 2007-AR7 Prospectus Supplement, filed May 30, 2007.

71.    The Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements or conducting adequate and reasonable due diligence of the underlying mortgage loans.  For example, CGMLT, as the depositor, was paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and CGMI, as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.  Thus, the greater the number of offerings, the greater the profit to CGMLT and CGMI.

72.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate diligence or otherwise to ensure the accuracy of the statements in the Registrations Statements pertaining to the Securitizations.

73.     For instance, Citi retained third-parties, including Clayton Holdings, Inc. ("Clayton"), to analyze the loans it was considering for inclusion in its securitizations, but waived a significant number of loans into its securitizations that these third-parties had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with the applicable guidelines or had compensating factors that excused the failure of the loans to comply with underwriting guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

74.     Citi was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to Citi by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from its third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed

by the third-party due diligence firms, Citi failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

75.    Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 42 percent of the mortgage loans Citi submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 31 percent of the loans were subsequently waived in by Citi without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested.   *See* FCIC Report at 167.

76.    Likewise, in 2006, Richard Bowen, the Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group within Citi, began raising serious concerns to Citi's senior management about the poor quality of the loans Citi was acquiring from third-party originators and then securitizing.  The Consumer Lending Group housed Citi's consumer-lending activities, including prime and subprime mortgages, as well as Citi's purchase of loans from originators other than Citi's origination arm, CitiMortgage.  As chief underwriter, Mr. Bowen was charged with the underwriting responsibility for over $90 billion annually of residential mortgage production; in other words, his responsibility was "to ensure that these mortgages met the credit standards required by Citi credit policy."  Written Testimony of Richard M. Bowen, III to the FCIC, April 7, 2010 ("Bowen Testimony") at 1.

77.    Mr. Bowen discovered serious issues with the loans Citi purchased, both prime and subprime loans.  On the prime side, Citi had represented and warranted that the mortgages were underwritten to Citi's credit guidelines.  However, in 2006, Mr. Bowen discovered that

some 60% of these mortgages were defective, with that figure rising to 80% in 2007.  On the subprime side, vast pools of subprime loans, totaling over $300 million, were purchased even though they failed to meet Citi's credit policy criteria.  Bowen Testimony at 1-2.

78.     Citi's due diligence process was woefully inadequate.  For example, an underwriting department called "Quality Assurance" was supposed to review the prime loans that Citi purchased, as Citi would subsequently represent and warrant to investors that these loans met Citi's underwriting criteria.  According to Citi's policy, at least 95% of the prime loans the Quality Assurance department reviewed were required to have an "agree" designation, meaning Citi's underwriters agreed with the originator's underwriting decision.  The Quality Assurance Department would then report these results to the Third Party Originators Committee ("TPO Committee"), which had "overall responsibility for managing the selling mortgage company relationships."  Bowen Testimony at 4-5.

79.     However, Mr. Bowen soon discovered that the reports to the TPO Committee were, at the least, highly misleading.  In fact, many of the "agree" decisions were actually "agree contingent," meaning that the "agree" decision was contingent upon receiving documents that were missing from the loan file.  Quality Assurance was reporting both types of designations together, even though the "agree contingent" decisions were missing documents required by Citi's policies.  In reality, only 40% of the loans Quality Assurance reviewed properly received an "agree" designation, with 55% receiving the misleading "agree contingent" label.  Bowen Testimony at 5-6.  A follow-up study found even more staggering results, with a 70% defect rate in the "agree" designations.  Bowen Testimony at 7.

80.     The same themes of underwriting breaches ran through the subprime origination channel as well.  According to Citi's policy, Citi underwriters were required to underwrite a

statistically significant sample of a prospective pool of subprime loans, approving only those loans that met Citi policy guidelines.  However, in the third quarter of 2006, Citi's "Wall Street Chief Risk Officer started changing many of the underwriting decisions from 'turn down' to 'approve'" in order to "artificially increase[] the approval rate on the sample.  This higher approval rate was then used as justification to purchase these pools."  Bowen Testimony 8-9.

81.     These flawed due diligence practices were especially troubling, because, in the words of Defendant Susan Mills, the Managing Director of Defendant CGMLT, these due diligence reviews "served as the primary . . . means by which we evaluated the loans that we purchased and securitized."  Written Testimony of Susan Mills to the FCIC, April 7, 2010 ("Mills Testimony") at 4.

82.     Defendant Mills personally witnessed a near tripling of early payment default rates in the loans her group was purchasing during the period from 2005 to 2007.  By the same token, "Bowen repeatedly expressed concerns to his direct supervisor and company executives about the quality and underwriting of mortgages that CitiMortgage purchased and then sold to the GSEs."  FCIC Report at 168.  Yet Citi failed to take any corrective action or improve its due diligence practices.

83.     To the contrary, despite these serious flaws in Citi's due diligence practices, securitization of these faulty loans became "a factory line," in the words of former Citi CEO Charles Prince.  "As more and more of these subprime mortgages were created as raw material for the securitization process, not surprisingly in hindsight, more and more of it was of lower and lower quality.  And at the end of that process, the raw material going into it was actually bad quality, it was toxic quality, and that is what ended up coming out the other end of the pipeline."  FCIC Report at 102-03.

III.     **THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS**

A.     **Compliance With Underwriting Guidelines**

84.     The Prospectus Supplements for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.

85.     The statements made in the Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's decisions to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

86.     The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the CMLTI 2006-WF2 Securitization, for which Wells Fargo was the originator, CGMR was the sponsor, CGMLT was the depositor, and CGMI was the underwriter, stated that "All of the mortgage loans were originated by Wells Fargo Bank or acquired by Wells Fargo Bank from correspondent lenders after re-underwriting such acquired mortgage loans generally in accordance with its underwriting guidelines then in effect."

87.     The CMLTI 2006-WF2 Prospectus Supplement stated that the originator "may make the determination that the prospective borrower warrants loan parameters beyond those

30

shown above," but emphasized that such decisions are made "[o]n a case-by-case basis" and only "upon the presence of acceptable compensating factors."

88.     With respect to the information evaluated by the originator, the CMLTI 2006-WF2 Prospectus Supplement stated that:  "The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."

89.     The Prospectus Supplement further stated that: "Verifications of employment, income, assets or mortgages may be used to supplement the loan application and the credit report in reaching a determination as to the applicant's ability to meet his or her monthly obligations on the proposed mortgage loan, as well as his or her other mortgage payments (if any), living expenses and financial obligations.  A mortgage verification involves obtaining information regarding the borrower's payment history with respect to any existing mortgage the applicant may have.  This verification is accomplished by either having the present lender complete a verification of mortgage form, evaluating the information on the credit report concerning the applicant's payment history for the existing mortgage, communicating, either verbally or in writing, with the applicant's present lender or analyzing cancelled checks provided by the applicant.  Verifications of income, assets or mortgages may be waived under certain programs offered by [the originator], but [the originator's] underwriting guidelines require, in most instances, a verbal or written verification of employment to be obtained.  In some cases, employment histories may be obtained through one of various employment verification sources, including the borrower's employer, employer-sponsored web sites, or third-party services

specializing in employment verifications."

90.     The Prospectuses and Prospectus Supplements for each of the Securitizations had similar representations to those quoted above.  The relevant representations in the Prospectuses and Prospectus Supplement pertaining to originating bank underwriting standards for each Securitization are reflected in Appendix A to this Complaint.  As discussed at paragraphs 120 through 149 below, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

91.     Further, for the vast majority of the Securitizations, the Prospectuses and Prospectus Supplements described additional representations and warranties concerning the mortgage loans backing the Securitizations that were made by the originator to the sponsor in the PSA.  Such representations and warranties, which are described more fully for each Securitization in Appendix A, included: (i) the mortgage loans were underwritten in accordance with the originator's underwriting guidelines in effect at the time of origination, subject to only limited exceptions; (ii) the mortgage loan was made in compliance with, and is enforceable under, all applicable local, state and federal laws and regulations; (iii) each mortgage loan was current as to all required payments; (iv) the mortgage loan seller had good title to each mortgage loan and each loan was subject to no offsets, defenses, counterclaims, or rights of rescission; and (v) the origination and collection practices used by the originator with respect to each mortgage note and mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business.

92.     The inclusion of these representations in the Prospectuses and Prospectus

Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and its compliance with the underwriting guidelines described in the Prospectuses and Prospectus Supplements. These representations were material to a reasonable investor's decision to purchase the Certificates.

**B.      Statements Regarding Occupancy Status Of Borrower**

93.      The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations. Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property. The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans." This table divided all the loans in the collateral group by occupancy status, e.g., into the categories: (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner." For each category, the table stated the number of loans in that category. Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[7]

**Table 4**

| Transaction | Supporting Loan Group | Primary or Owner Occupied | Second Home/Secondary | Investor |
|---|---|---|---|---|
| ARSI 2005-W2 | Group I | 86.10% | 1.10% | 12.80% |
| CMLTI 2005-10 | Group I-3 | 72.35% | 4.84% | 22.81% |
| CMLTI 2005-7 | Group 1-2 | 85.05% | 2.93% | 12.02% |
| CMLTI 2005-HE3 | Group I | 92.08% | 3.84% | 4.08% |
| CMLTI 2005-HE4 | Group I | 85.35% | 1.76% | 12.89% |

---

[7]      Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories: owner occupied, investor, and second home. These numbers have been converted to percentages.

| Transaction | Supporting Loan Group | Primary or Owner Occupied | Second Home/Secondary | Investor |
|---|---|---|---|---|
| CMLTI 2006-AR2 | Group I-1 | 88.75% | 4.20% | 7.05% |
| CMLTI 2006-AR5 | Group 1-2 | 89.26% | 9.40% | 1.34% |
| CMLTI 2006-WF1 | Group I | 58.08% | 4.79% | 37.14% |
| CMLTI 2006-WF2 | Group I | 60.10% | 3.55% | 36.36% |
| CMLTI 2007-AR7 | Group 2 | 36.23% | 8.83% | 54.94% |

94.     As Table 4 makes clear, the Prospectus Supplements for all but one Securitization reported that a majority, and usually an overwhelming majority, of the mortgage loans in the Supporting Loan Groups were owner occupied, while a much smaller percentage were reported to be non-owner occupied (*i.e.* a second home or investor property).

95.     The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securitization that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default and more likely to care for their primary residence than borrowers who purchase homes as second homes or investments and live elsewhere, the percentage of loans in the collateral group of a securitization that are not secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.  As stated in the Prospectus Supplement for the CMLTI 2005-HE4 Securitization and other Securitizations: "With respect to each mortgaged property, unless otherwise provided in the related prospectus supplement, the borrower will have represented that the dwelling is either an owner-occupied primary residence or a vacation or second home that is not part of a mandatory rental pool and is suitable for year-round occupancy."

96.     Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small

differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed at paragraphs 108 through 118 below, the Registration Statement for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

### C.  Statements Regarding Loan-To-Value Ratios

97.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

98.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

99.     The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups are reflected in Table 5 below.[8]

--------------------

[8]   As used in this Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included

**Table 5**

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| ARSI 2005-W2 | Group I | 62.07% | 0% |
| CMLTI 2005-10 | Group I-3 | 87.38% | 0% |
| CMLTI 2005-7 | Group 1-2 | 94.00% | 0% |
| CMLTI 2005-HE3 | Group I | 72.59% | 0.03% |
| CMLTI 2005-HE4 | Group I | 57.93% | 0% |
| CMLTI 2006-AR2 | Group I-1 | 96.28% | 0% |
| CMLTI 2006-AR5 | Group 1-2 | 94.44% | 0% |
| CMLTI 2006-WF1 | Group I | 46.05% | 0% |
| CMLTI 2006-WF2 | Group I | 43.46% | 0% |
| CMLTI 2007-AR7 | Group 2 | 88.12% | 0% |

100.    As Table 5 makes clear, the Prospectus Supplement for eight of the ten

Securitizations reported that the majority of the mortgage loans in the Supporting Loan Groups

had an LTV ratio of 80 percent or less, and the Prospectus Supplements for all but one of the

Securitizations reported that no mortgage loans in the Supporting Loan Group had an LTV ratio

over 100 percent.

101.    The LTV ratio is among the most important measures of the risk of a mortgage

loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans

underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the

property will wipe out an owner's equity, and thereby give an owner an incentive to stop making

mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the

event of default.  The lower the LTV, the greater the "equity cushion," so the greater the

---

in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV
calculation).  Where the securitized lien is junior to another loan, the more senior lien has been
added to the securitized one to determine the numerator in the LTV calculation (this latter
calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

102.    Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed at paragraphs 113 through 118 below, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.

> **D.    Statements Regarding Credit Ratings**

103.    Credit ratings are assigned to the tranches of securities in mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  At the time the GSEs purchased their GSE Certificates in the Securitizations, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.  Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a result, RMBS securities with credit ratings between AAA or its equivalent through BBB or its equivalent were generally referred to as

"investment grade."

104.    Rating agencies determine the credit rating for each tranche of securities in a mortgage-backed securitization by comparing the likelihood of contractual principal and interest payments to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cash-flows based on the quality of the underlying mortgages by using sponsor provided loan level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[9]  This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the credit characteristics of the loans in the underlying collateral group and entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

105.    Credit ratings have been an important tool to gauge risk when making investment decisions.  In testimony before the Senate Permanent Subcommittee on Investigations, Susan Barnes, the North American Practice Leader for RMBS at S&P from 2005 to 2008, confirmed that the rating agencies relied upon investment banks to provide accurate information about the loan pools:

---

[9]  "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first.  These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

The securitization process relies on the quality of the data generated about the loans going into the securitizations. S&P relies on the data produced by others and reported to both S&P and investors about those loans . . . . S&P does not receive the original loan files for the loans in the pool. Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors. (SPSI hearing testimony, April 23, 2010).

106. For almost a hundred years, investors like pension funds, municipalities, insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments. Fannie Mae and Freddie Mac's respective internal policies limited their purchases of private label RMBS to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

107. Each tranche in the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche. The Defendants reported the credit ratings for each tranche in the Prospectus Statements. The credit rating provided for each of the GSE Certificates was always AAA or its equivalent. The accuracy of these ratings was material to a reasonable investor's decision to purchase the Certificates. As set forth in Table 8, *infra* at paragraph 153, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV.   FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

### A.   The Statistical Data Provided In The Prospectus Supplements Concerning Owner Occupancy And LTV Ratios Was Materially False

108. A review of loan-level data was conducted in order to assess whether the

statistical information provided in the Prospectus Supplements was true and accurate.  For each

Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan

Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting

Loan Group.  The sample data confirms, at a statistically-significant level, material

misrepresentations of underwriting standards and of certain key characteristics of the mortgage

loans across the Securitizations.  The data review demonstrates that the data concerning owner

occupancy percentages and LTV ratios was false and misleading.

### 1.     Owner Occupancy Data Was Materially False

109.    The data review has revealed that the owner occupancy statistics reported in the

Prospectus Supplements were materially false and inflated.  In fact, far fewer underlying

properties were occupied by their owners than disclosed in the Prospectus Supplements, and

more correspondingly were held as second homes or investment properties.

110.    To determine whether a given borrower actually occupied the property as

claimed, a number of tests were conducted, including, *inter alia*, (i) whether, months after the

loan closed, the borrower's tax bill was being mailed to the property securing the mortgage or to

a different address; (ii) whether the borrower had claimed a tax exemption on the property; and

(iii) whether the mailing address of the property was reflected in the borrower's credit reports,

tax records, or lien records.  Failing two or more of these tests is a strong indication that the

borrower did not live at the mortgaged property and instead used it as a second home or an

investment property, both of which make it more likely that a borrower will not repay the loan.

111.    A significant number of the loans failed two or more of these tests, indicating that

the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false

and misleading.  For example, for the CMLTI 2005-HE3 Securitization, for which CGMR was

the sponsor, CGMLT was the depositor, and CGMI was the underwriter, the Prospectus

Supplement stated that only 7.92 percent of the underlying properties by loan count in the

Supporting Loan Group were not owner-occupied.  But the data review revealed that, for 14.39

percent of the properties represented as owner-occupied, the owners in fact lived elsewhere,

indicating that the true percentage of non-owner occupied properties was 21.17 percent, nearly

*triple* the percentage reported in the Prospectus Supplement.[10]

112.    The data review revealed that for each Securitization, the Prospectus Supplement

misrepresented the percentage of non-owner occupied properties.  The true percentage of non-

owner occupied properties, as determined by the data review, versus the percentage stated in the

Prospectus Supplement for each Securitization is reflected in Table 6 below.  Table 6

demonstrates that the Prospectus Supplements for each Securitization understated the percentage

of non-owner occupied properties by at least 5 percent, and for many Securitizations by ten

percent or more.

**Table 6**

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[11] | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| ARSI 2005-W2 | Group I | 13.90% | 11.81% | 24.07% | 10.17% |
| CMLTI 2005-10 | Group I-3 | 27.65% | 16.22% | 39.98% | 11.73% |

[10]   This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 7.92 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 92.08 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 14.39 percent).

[11]   As described more fully in paragraph 110, failing two or more tests of owner-occupancy is a strong indication that the borrower did not live at the mortgage property and instead used it as a second home or an investment property.

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[11] | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| CMLTI 2005-7 | Group 1-2 | 14.95% | 18.07% | 30.32% | 15.37% |
| CMLTI 2005-HE3 | Group I | 7.92% | 14.39% | 21.17% | 13.25% |
| CMLTI 2005-HE4 | Group I | 14.65% | 15.57% | 27.94% | 13.29% |
| CMLTI 2006-AR2 | Group I-1 | 11.25% | 15.78% | 25.25% | 14.01% |
| CMLTI 2006-AR5 | Group 1-2 | 10.74% | 18.70% | 27.43% | 16.69% |
| CMLTI 2006-WF1 | Group I | 41.92% | 10.76% | 48.17% | 6.25% |
| CMLTI 2006-WF2 | Group I | 39.90% | 12.56% | 47.45% | 7.55% |
| CMLTI 2007-AR7 | Group 2 | 63.77% | 13.89% | 68.80% | 5.03% |

## 2.      Loan-To-Value Data Was Materially False

113.    The data review has further revealed that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated, as more specifically set out below.  For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

114.    Applying the AVM to the available data for the properties securing the sampled loans shows that the appraised value given to such properties was significantly higher than the actual value of such properties.  The result of this overstatement of property values is a material understatement of LTV.  That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value.  This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default.  As stated in the Prospectus Supplement for CMLTI 2005-10, "mortgage loans with high loan-to-value ratios leave the related borrower with

little or no equity in the related mortgaged property which may result in losses with respect to these mortgage loans."

115.    For example, for the CMLTI 2006-WF1 Securitization, which was sponsored by CGMR, deposited by CGMLT, and underwritten by CGMI, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent.  In fact, 17.24 percent of the sample of loans included in the data review had LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 46.05 percent of the loans had LTV ratios at or below 80 percent.  The data review indicated that only 36.35 percent of the loans had LTV ratios at or below 80 percent.

116.    The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well as the percentage of loans that had an LTV ratio at or below 80 percent.  Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group with LTV ratios at or below 80 percent, versus the percentage as reported in the Prospectus Supplement.  The percentages listed in Table 7 were calculated by aggregated principal balance.

Table 7

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At Or Under 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At Or Under 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| ARSI 2005-W2 | Group I | 62.07% | 45.67% | 0% | 12.38% |
| CMLTI 2005-10 | Group I-3 | 87.38% | 50.17% | 0% | 7.73% |
| CMLTI 2005-7 | Group 1-2 | 94.00% | 49.18% | 0% | 7.71% |
| CMLTI 2005-HE3 | Group I | 72.59% | 43.66% | 0.03% | 10.84% |
| CMLTI 2005-HE4 | Group I | 57.93% | 44.45% | 0% | 14.50% |
| CMLTI 2006-AR2 | Group I-1 | 96.28% | 55.61% | 0% | 4.77% |
| CMLTI 2006-AR5 | Group 1-2 | 94.44% | 62.25% | 0% | 5.16% |

| CMLTI 2006-WF1 | Group I | 46.05% | 36.35% | 0% | 17.24% |
| CMLTI 2006-WF2 | Group I | 43.46% | 36.40% | 0% | 14.60% |
| CMLTI 2007-AR7 | Group 2 | 88.12% | 49.76% | 0% | 16.71% |

117.     As Table 7 demonstrates, the Prospectus Supplements for the Securitizations

reported that for all but one of the Securitizations none of the mortgage loans in the Supporting

Loan Groups had an LTV ratio over 100 percent.  With respect to that one exception, the

percentage of mortgage loans with a reported LTV ratio over 100 percent was very small—less

than 1 percent.  In contrast, the data review revealed that at least 4.77 percent of the mortgage

loans for each Securitization had an LTV ratio over 100 percent, and for most Securitizations this

figure was much higher.  Indeed, for six of the Securitizations the data review revealed that ten

percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

118.     These inaccuracies with respect to reported LTV ratios also indicate that the

representations in the Registration Statements relating to appraisal practices were false, and that

the appraisers themselves, in many instances, furnished appraisals that they understood were

inaccurate and that they knew bore no reasonable relationship to the actual value of the

underlying properties.  Indeed, independent appraisers following proper practices, and providing

genuine estimates as to valuation, would not systematically generate appraisals that deviate so

significantly (and so consistently upward) from the true values of the appraised properties.  This

conclusion is further confirmed by the findings of the FCIC, which identified "inflated

appraisals" as a pervasive problem during the period of the Securitizations, and determined

through its investigation that appraisers were often pressured by mortgage originators, among

others, to produce inflated results.  *See* FCIC Report at 91-92.

B.      **The Originators Of The Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

119.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  This is confirmed by the systematically misreported owner occupancy and LTV statistics, discussed above, and by (1) government investigations into originators' underwriting practices, which have revealed widespread abandonment of the originators' reported underwriting guidelines during the relevant period; (2) the collapse of the Certificates' credit ratings; and (3) the surge in delinquency and default in the mortgages in the Securitizations.

1.      **Government Investigations Have Confirmed That The Originators Of The Loans In The Securitizations Systematically Failed To Adhere To Their Underwriting Guidelines**

120.    For nine of the ten Securitizations the Citi Defendants sold to the GSEs, CGMR would purchase loans originated by other entities, including CitiMortgage, as listed *supra* in paragraphs 26-27.  The prospectus supplements for the Securitizations represented that the underlying mortgages were originated according to the originators' guidelines.  For example, the CMLTI 2006-WF2 Securitization stated that "[a]ll of the mortgage loans were originated by Wells Fargo Bank or acquired by Wells Fargo Bank from correspondent lenders after re-underwriting such acquired mortgage loans generally in accordance with its underwriting guidelines then in effect."  However, in reality, these originators systematically failed to adhere to their underwriting guidelines.

121.    Several government reports and investigations have focused on the abandonment of underwriting guidelines, describing rampant underwriting failures throughout the period of the

Securitizations, and, more specifically, describing underwriting failures by the very originators whose loans were included by the Citi Defendants in the Securitizations.

122.    For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Numerous originators who originated loans that the Citi Defendants eventually sold to the GSEs are on that list, including Wells Fargo, Countrywide, American Home, Argent, and WMC.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.

123.    The Citi Defendants had the opportunity to review loan files from such originators as part of their due diligence and their obligations in the securitization process.  Such a review would have revealed that the actual underwriting practices of the originators, including originators such as Wells Fargo, Countrywide, American Home, Argent, and WMC were vastly inconsistent with the statements in the Offering Materials regarding the high standards of the originators and the Citi Defendants.  That the originators had serious origination underwriting breakdowns is also confirmed by the testimony of Mr. Bowen, who gave detailed statistics about the reject rates for loans bought by Citigroup from third party originators like Wells Fargo, Countrywide, and American Home.

### i.    Wells Fargo

124.    Wells Fargo Bank, N.A. originated all of the mortgage loans for the CMLTI 2006-WF1 and CMLTI 2006-WF2 offerings. Wells Fargo Bank, N.A. also originated approximately 78.90 percent of the Group I-1 Mortgage Loans in the CMLTI 2006-AR2

offering.

125.    In March 2009, residential mortgage-backed securities investors filed suit against

Wells Fargo, alleging that it had misrepresented its underwriting guidelines and loan quality.  *See*

*In re Wells Fargo Mortgage-Backed Certificates Litig*., No. 09-CV-01376 (N.D. Cal. 2009).  In

denying in part a motion to dismiss, the court found that plaintiffs had adequately pled that

"variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and

that this conduct "infected the entire underwriting process."  *In re Wells Fargo Mortgage-Backed*

*Certificates Litig.*, 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010).  Wells Fargo agreed to settle the

investors' claims.

126.    Further, a number of government actors have announced investigations of Wells

Fargo's lending practices.  In July 2009, the Attorney General of Illinois filed a lawsuit, *People*

*v. Wells Fargo & Co.*, No. 09-CH-26434 (Ill. Cir. Ct. 2009), alleging that Wells Fargo "engaged

in deceptive practices by misleading Illinois borrowers about their mortgage terms."  The

complaint details how borrowers were placed into loans that were "unaffordable and unsuitable,"

and how Wells Fargo "failed to maintain proper controls."

127.    In April 2010, the City of Memphis filed its First Amended Complaint in

*Memphis v. Wells Fargo Bank*, No. 09-CV-02857 (W.D. Tenn. 2009), alleging that Wells Fargo

"failed to underwrite African-American borrowers properly."  A similar lawsuit was filed by the

City of Baltimore, *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*, No. 08-CV-

00062 (D. Md. 2008).  The *City of Memphis* and *City of Baltimore* complaints include sworn

declarations from many former Wells Fargo employees, which provide evidence of predatory

lending and abandonment of underwriting guidelines.  For instance, Camille Thomas, a loan

processor at Wells Fargo from January 2004 to January 2008, stated under oath that loans were

granted based on inflated appraisals, which allowed borrowers to get larger loans than they could afford due to the impact on the LTV calculation and some loans were even granted based on falsified income documents.  Similarly, another affidavit by Doris Dancy, a credit manager at Wells Fargo from July 2007 to January 2008, stated that managers put pressure on employees to convince people to apply for loans, even if the person could not afford the loan or did not qualify for it.  She was also aware that loan applications contained false data, used to get customers to qualify for loans.

128.    The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007.  Ms. Parmer confirmed that, during her tenure, Wells Fargo's underwriting standards were loosening, adding that they were being applied "on the fly" and that "[p]eople were making it up as they went." She also told the FCIC that 99 percent of the loans she would review in a day would get approved, and that, even though she later became a "fraud analyst," she never received any training in detecting fraud.  The FCIC's January 2011 Report described how "hundreds and hundreds and hundreds of fraud cases" that Ms. Palmer knew were identified within Wells Fargo's home equity loan division were not reported to FinCEN.[12]  In addition, according to Ms. Palmer, at least half the loans she flagged for fraud were nevertheless funded, over her objections.

129.    In July 2011, the Federal Reserve Board issued a consent cease and desist order and assessed an $85 million civil money penalty against Wells Fargo & Co. and Wells Fargo Financial, Inc.  According to the Federal Reserve's press release, the order addressed in part

_____

[12]    FinCEN is the Financial Crimes Enforcement Network, a bureau within the Treasury Department that collects and analyzes information regarding financial fraud.

allegations that "Wells Fargo Financial sales personnel falsified information about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes."  The Federal Reserve Board also found that the poor practices of Wells Fargo were fostered by Wells Fargo Financial's incentive compensation and sales quota programs, and the lack of adequate controls to manage the risks resulting from these programs.

### ii.      Countrywide

130.     Countrywide was similarly derelict in its underwriting obligations.  Countrywide originated approximately 43.26 percent of the Group I mortgage loans in the CMLTI 2006-AR5 offering.

131.     In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  The FCIC Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*See* FCIC Report, at xxii.

132.     Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these

defendants' motions for summary judgment, the United States District Court for the Central District of California found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of Countrywide's underwriting processes. The court noted that the SEC presented evidence that Countrywide "routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines . . . ."  The court concluded that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines . . . ." *S.E.C. v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010).  Mozilo, Sambol, and Sieracki subsequently settled with the SEC.

133.    The testimony and documents only recently made available to the GSEs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards.  For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

### iii.    American Home

134.    Likewise, American Home failed to follow its origination guidelines.  American Home originated 83.30 percent of the mortgage loans in Loan Group I for the CMLTI 2007-AR7

offering.

135.    An internal American Home "Credit Update" presentation from October 2005, which was made public in June 2008, made clear that American Home's underwriting guidelines were to be either relaxed substantially or essentially rendered meaningless, in order to allow American Home to make loans to high-risk borrowers.  Specifically, the Credit Update sets forth a new "interpretation" of guidelines that included:

- Not requiring verification of income sources on stated income loans;

- Reducing the time that needs to have passed since the borrower was in bankruptcy or credit counseling;

- Reducing the required documentation for self-employed borrowers; and

- Broadening the acceptable use of second and third loans to cover the full property value.

136.    An internal American Home e-mail sent on November 2, 2006, made public in June 2008, from Steve Somerman, an American Home Senior Vice President of Product and Sales Support in California and co-creator of the American Home's "Choice Point Loans" program, to loan officers nationwide, stated that American Home would make a loan to virtually any borrower, regardless of the borrower's ability to verify income, assets or even employment. The e-mail specifically encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (3) "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history.  *See* Complaint, *In re American Home Mortgage Securities Litigation*, No. 07-MD-1898 (TCP) (E.D.N.Y. June 3, 2008).

137.    American Home is involved in several criminal probes and investigations, and federal prosecutors have convicted one American Home sales executive, Kourash Partow, of mortgage fraud.  *See* Judgment in a Criminal Case, *U.S. v. Partow*, Case No. 3:06-CR-00070-08-HRH, Aug. 31, 2007; *see also U.S. v. Partow,* 283 Fed. Appx. 476 (9th Cir. 2008).  After his conviction, Partow, who worked for Countrywide before joining American Home, sought a lighter sentence on the grounds that his former employers (Countrywide and American Home) both had knowledge of the loan document inaccuracies and in fact encouraged manipulation by intentionally misrepresenting the performance of loans and the adequacy of how the loans were underwritten.  Partow admitted that he would falsify clients' income or assets in order to get loans approved, and that American Home did not require documentary verification of such figures.  "Loan Data Focus of Probe, Countrywide Files May Have Included Dubious Information," *The Wall Street Journal*, March 22, 2008; MSNBC.com, "Inside the fiasco that led to the mortgage mess and Countrywide's collapse," updated March 22, 2009.

### iv.    Argent

138.    Argent also failed to follow its underwriting guidelines.  Argent originated 86.32% percent of the mortgage loans in Loan Group I for the CMLTI 2005-HE4 offering; it also originated the loans in the ARSI 2005-W2 offering.

139.    According to a December 7, 2008 article in the *Miami Herald*, employees of Argent Mortgage had a practice of actively assisting brokers to falsify information on loan applications.  They would "tutor[] . . . mortgage brokers in the art of fraud."  Employees "taught [brokers] how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved.  "Borrowers Betrayed, Part 4," *Miami Herald*, Dec. 7, 2008.

140.    Orson Benn, a former Argent Vice President who went to prison for his role in facilitating mortgage fraud, has stated that at Argent "the accuracy of loan applications was not a priority."  "Borrowers Betrayed, Part 4," *Miami Herald*, Dec. 7, 2008.  Mr. Benn was the head of a crime ring that fabricated loan applications in order to pocket the loan fees; Mr. Benn himself pocketed a $3,000 kickback for each loan he helped secure.  FCIC Report at 164.  Of the 18 defendants charged in the Argent ring, 16 have been convicted or pled guilty, FCIC Report at 164, including Mr. Benn, who was sentenced to 18 years in prison, "Ex-Argent Mortgage VP Sentenced For Fraud," *North Country Gazette*, Sept. 5, 2008.

141.    Other jurisdictions have also investigated Argent for its mortgage origination practices.  On June 22, 2011, a grand jury in Cuyahoga County, Cleveland, indicted nine employees of Argent for their suspected roles in approving fraudulent home loans.  The case, investigated by the Cuyahoga County Mortgage Fraud Task Force, alleges that the employees helped coach mortgage brokers about how to falsify loan documents to misstate the source or existence of down payments, as well as a borrower's income and assets.  Argent was Cleveland's number one lender in 2004, and originated over 10,000 loans during the time span 2002 through 2005.  This was the first time in Ohio, and one of few instances nationwide, that a mortgage fraud investigation has led to criminal charges against employees of a subprime lender.  Mark Gillespie, "Former employees of subprime mortgage lender indicted by Cuyahoga County grand jury," *The Plain Dealer*, June 23, 2011.

142.    Indeed, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, noted that "some Argent employees played fast and loose with the rules."  She "personally saw some stuff [she] didn't agree with," such as "[Argent] account managers remove documents from files and create

documents by cutting and pasting them."  "The Subprime House of Cards," *Cleveland Plain Dealer*, May 11, 2008.

143.    Similarly, Argent was also not diligent about confirming accurate appraisals for the properties for which it was issuing mortgages.  Steve Jernigan, a fraud investigator at Argent, said that he once went to check on a subdivision for which Argent had made loans.  The address on the loans turned out to be in the middle of a cornfield; the appraisals had all been fabricated. The same fake picture had been included in each file.  Michael W. Hudson, "Silencing the Whistle-blowers," *The Investigative Fund*, May 10, 2010.

144.    In 2007, Citigroup acquired Argent from its parent ACC Capital Holdings Corp. This acquisition is notable because Mr. Bowen, who was described above was a Chief Underwriter within Citigroup's Consumer Lending Group was given the opportunity to review Argent before Citigroup acquired it.  He reported that "large numbers" of Argent's loans were "not underwritten according to the representations that were there."  FCIC Hearing Transcript, Apr. 7, 2010, p. 239.  Despite Mr. Bowen's warnings, however, Citigroup proceeded with the acquisition and in fact touted it, stating that "[t]hrough this acquisition, we gain important operational and pricing efficiencies . . . from point of origination through securitization and servicing."  Citigroup Press Release, Aug. 31, 2007.

v.    **WMC**

145.    WMC also failed to follow its underwriting guidelines.  WMC originated 82.97 percent of the mortgage loans in Loan Group I for the CMLTI 2005-HE3 offering.

146.    WMC employed reckless underwriting standards and practices, as described more fully below, that resulted in a huge amount of foreclosures, ranking WMC fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the

"Worst Ten" metropolitan areas.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller

of the Currency Press Release, November 13, 2008.  General Electric, which had purchased

WMC in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in

the third quarter of that year.  *See*, *e.g.*, Diane Brady, Adventures of a Subprime Survivor,

Bloomberg Businessweek, Oct. 29, 2007 (available at http://www.businessweek.com

/magazine/content/07_44/b4056074.htm).

147.    WMC's reckless loan originating practices were noticed by regulatory authorities.

In June 2008, the Washington State Department of Financial Institutions, Division of Consumer

Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke

License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees

(the "Statement of Charges") against WMC Mortgage and its principal owners individually.  *See*

Statement of Charges, No. C-07-557-08-SC01, Jun. 4, 2008.  The Statement of Charges

described a review of 86 loan files, which revealed that at least 76 of those loans were defective

or otherwise in violation of Washington state law.  *Id*.  Among other things, the investigation

uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers,

understated amounts of finance charges on loans, understated amounts of payments made to

escrow companies, understated annual percentage rates to borrowers and committed many other

violations of Washington State deceptive and unfair practices laws.  *Id*.

### vi.    Inflated Appraisals

148.    The originators of the mortgage loans underlying the Securitizations went beyond

the systematic disregard of their own underwriting guidelines.  Indeed, as the FCIC has

confirmed, mortgage loan originators throughout the industry pressured appraisers, during the

period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed

for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization.  This resulted in lower LTV ratios, discussed above, which in turn made the loans appear less risky to the investors than they were.

149.    As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again . . . .  [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"  *See* Testimony of Jim Amorin to the FCIC, April 23, 2009, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations

### 2.    The Collapse Of The Certificates' Credit Ratings Further Indicates That The Mortgage Loans Were Not Originated In Adherence To The Stated Underwriting Guidelines

150.    The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were impaired from the start.

151.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally

assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of

the mortgage loan collateral and underwriting practices set forth in the Registration Statements.

These ratings were artificially inflated, however, as a result of the very same misrepresentations

that the Defendants made to investors in the Prospectus Supplements.

152.    The Citi Defendants provided or caused to be provided loan level information to

the rating agencies that they relied upon to calculate the Certificates' assigned ratings, including

the borrower's LTV ratio, debt-to-income ratio, owner occupancy status, and other loan level

information described in the aggregation reports Prospectus Supplements.  Because the

information that the Citi Defendants provided or caused to be was false, the ratings were inflated

and the level of subordination that the rating agencies required for the sale of AAA (or its

equivalent) certificates was inadequate to provide investors with the level of protection that those

ratings signified.  As a result, the GSEs paid Defendants inflated prices for purported AAA (or

its equivalent) Certificates, unaware that those Certificates actually carried a severe risk of loss

and inadequate credit enhancement.

153.    Since the issuance of the Certificates, the ratings agencies have dramatically

downgraded their ratings to reflect the revelations regarding the true underwriting practices used

to originate the mortgage loans, and the true value and credit quality of the mortgage loans.

Table 8 details the extent of the downgrades.[13]

---

[13]   Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

**Table 8**

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| ARSI 2005-W2 | A1 | Aaa/AAA/AAA | Baa1/AA/B |
| CMLTI 2005-10 | IA3A | Aaa/AAA/-- | Caa3/CCC/-- |
| CMLTI 2005-7 | 1A2 | Aaa/Not Rated/AAA | Caa3/--/D |
| CMLTI 2005-HE3 | A1 | Aaa/AAA/AAA | Aa1/AAA/AAA |
| CMLTI 2005-HE4 | A1 | Aaa/AAA/AAA | A3/AAA/BB |
| CMLTI 2006-AR2 | IA1 | Aaa/--/AAA | Caa3/--/C |
| CMLTI 2006-AR5 | 1A2A | - -/AAA/AAA | - -/CCC/C |
| CMLTI 2006-WF1 | A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| CMLTI 2006-WF2 | A1 | Aaa/AAA/AAA | Caa3/CCC/C |
| CMLTI 2007-AR7 | A2A | Aaa/--/AAA | Ca/--/D |

> 3.     **The Surge In Mortgage Delinquencies And Defaults Further Indicates That The Mortgage Loans Were Not Originated In Adherence To The Stated Underwriting Guidelines**

154.    Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with the applicable underwriting guidelines as represented in the Registration Statements.

155.    Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| ARSI 2005-W2 | Group I | 34.8% |
| CMLTI 2005-10 | Group I-3 | 28.1% |
| CMLTI 2005-7 | Group 1-2 | 28.2% |
| CMLTI 2005-HE3 | Group I | 70.7% |
| CMLTI 2005-HE4 | Group I | 34.3% |
| CMLTI 2006-AR2 | Group I-1 | 14.3% |
| CMLTI 2006-AR5 | Group 1-2 | 17.5% |
| CMLTI 2006-WF1 | Group I | 32.9% |
| CMLTI 2006-WF2 | Group I | 37.0% |
| CMLTI 2007-AR7 | Group 2 | 53.8% |

156.    The confirmed misstatements concerning owner occupancy and LTV ratios, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across the Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.    FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES

157.    In total, between September 13, 2005 and May 31, 2007, Fannie Mae and Freddie Mac purchased over $3.5 billion in residential mortgage-backed securities issued in connection with the Securitizations.

158.    Table 10 reflects Freddie Mac's purchases of the Certificates.[14]

---

[14]   Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par. The "Settlement Date," refers to the date by which a buyer must pay for the securities delivered by the seller.

**Table 10**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| ARSI 2005-W2 | A1 | 040104NW7 | 9/27/2005 | 1,351,319,000 | 100 | CGMI |
| CMLTI 2005-HE3 | A1 | 17307GXJ2 | 9/13/2005 | 380,972,000 | 100 | CGMI |
| CMLTI 2005-HE4 | A1 | 17307GQ84 | 11/30/2005 | 340,420,000 | 100 | CGMI |
| CMLTI 2007-AR7 | A2A | 17312YAB8 | 5/31/2007 | 117,893,000 | 101.9063 | CGMI |

159.    Table 11 reflects Fannie Mae's purchases of the Certificates:

**Table 11**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance ($) | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| CMLTI 2005-10 | IA3A | 17307GT73 | 2/3/2006 | 148,577,697 | 100.6719 | CGMI |
| CMLTI 2005-7 | 1A2 | 17307GA57 | 10/17/2005 | 130,480,732 | 100.2539 | CGMI |
| CMLTI 2006-AR2 | IA1 | 17307G6K9 | 6/30/2006 | 115,073,166 | 99.5703 | UBS Securities LLC |
| CMLTI 2006-AR5 | 1A2A | 17309FAD0 | 6/30/2006 | 36,920,000 | 99.8034 | CGMI |
| CMLTI 2006-WF1 | A1 | 17307G4E5 | 3/30/2006 | 425,206,000 | 101.3047 | CGMI |
| CMLTI 2006-WF2 | A1 | 17309BAL1 | 5/31/2006 | 484,445,000 | 101.1875 | CGMI |

160.    The statements and assurances in the Registration Statements regarding the credit

quality and characteristics of the mortgage loans underlying the GSE Certificates, and the

origination and underwriting practices used to make these loans, were material to a reasonable

investor's decision to purchase the GSE Certificates.

161.    The false statements of material facts and omissions of material facts in the

Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused

Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages, including

without limitation depreciation in the value of the securities.  The mortgage loans underlying the

GSE Certificates experienced defaults and delinquencies at a much higher rate than they would

have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the Trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

162.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

163.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of the GSE Certificates.

164.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Based upon sales of the Certificates or similar certificates in the secondary market, Defendants proximately caused hundreds of millions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against Defendants CGMI, CGMLT, and the Individual Defendants)

165.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

166.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.  This claim is brought against Defendant CGMI with respect to each of the Registration Statements, and is brought against Defendants CGMLT and the Individual Defendants with respect to the Registration Statements

filed by CGMLT that registered securities that were bona fide offered to the public on or after September 6, 2005.

167.     This claim is predicated upon Defendant CGMI's strict liability for making false and materially misleading statements in each of the Registration Statements for the Securitizations and for omitting facts necessary to make the facts stated therein not misleading. CGMLT and the Individual Defendants are strictly liable for making false and materially misleading statements in the Registration Statements filed by CGMLT that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to eight of the ten Securitizations (as specified in Tables 1 and 2 above), including the related Prospectus Supplements, and for omitting facts necessary to make the facts stated therein not misleading.

168.     Defendant CGMI served as the underwriter of each of the Securitizations, and as such, is liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

169.     Defendant CGMLT filed the four Registration Statements under which nine of the ten Securitizations were carried out.  As a depositor, Defendant CGMLT is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, it is liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

170.     At the time Defendant CGMLT filed four Registration Statements applicable to nine of the Securitizations, the Individual Defendants were officers and/or directors of CGMLT.

In addition, the Individual Defendants signed those Registration Statements and either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

171.    At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statement, including to Fannie Mae and Freddie Mac.

172.    The untrue statements of material facts and omissions of material facts in the Registration Statements are set forth above in Section IV and pertain to, among other things, compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

173.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements.  Fannie Mae and Freddie Mac made these purchases in the primary market and shortly after issuance.  At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and misleading statements and omissions alleged herein, and if they had known those facts, they would not have purchased the GSE Certificates.

174.    CGMI owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that

there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading. The Individual Defendants owed the same duty with respect to the Registration Statements they signed that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to eight of the Securitizations.

175. CGMI and the Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation. In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein. In addition, CGMLT, though subject to strict liability without regard to whether it performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

176. Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

177. The time period from June 2, 2009 through August 29, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and Citi, CGMI, CGMLT, Citibank NA, and CGMR. In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

178. By reason of the conduct herein alleged, CGMI, CGMLT, and the Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against Defendants CGMLT and CGMI)

179. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

180.     This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements for the Securitizations listed in paragraph 2, with the exception of CMLTI 2006-AR2.

181.     This claim is predicated upon CGMI's negligence in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for each of the Securitizations listed in paragraph 2 that CGMI sold.  Defendant CGMLT acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements, which are applicable to nine of the Securitizations.

182.     CGMI is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates, except for CMLTI 2006-AR2.  CGMI offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac its GSE Certificates, except for CMLTI 2006-AR2, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

183.     CGMI offered and sold the GSE Certificates, except for CMLTI 2006-AR2, to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances which they were made, not misleading.  CGMI reviewed and participated in drafting the Prospectuses.

184.     CGMI successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates, except for CMLTI 2006-AR2.  As underwriter, CGMI obtained substantial commissions based upon the amount it received from the sale of the Certificates to the public.

185.    CGMI offered the GSE Certificates, except for CMLTI 2006-AR2, for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

186.    CGMLT is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements it filed.  These Prospectuses were the primary documents CGMLT used to sell Certificates for the nine Securitizations under those Registration Statements.  CGMLT offered the Certificates publicly and actively solicited their sale, except for CMLTI 2006-AR2, including to Fannie Mae and Freddie Mac.

187.    With respect to the nine Securitizations for which it filed Registration Statements, CGMLT offered GSE Certificates, except for CMLTI 2006-AR2, to Fannie Mae and Freddie Mac by means of Prospectuses that contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, CGMLT reviewed and participated in drafting the Prospectuses.

188.    CGMLT offered the GSE Certificates, except for CMLTI 2006-AR2, for sale by the use of means or instruments of transportation and communication in interstate commerce.

189.    Each of CGMI and CGMLT actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, except for CMLTI 2006-AR2, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates, except for CMLTI 2006-AR2.

190.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted

were material to a reasonable investor reviewing the Prospectuses, and were specifically material to Fannie Mae and Freddie Mac.

191.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

192.    CGMLT and CGMI offered and sold the GSE Certificates, except for CMLTI 2006-AR2, offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

193.    CGMI owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  CGMLT owed the same duty with respect to the Prospectuses for the Securitizations carried out under the four Registration Statements filed by it.

194.    CGMLT and CGMI failed to exercise such reasonable care.  These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

195.    In contrast, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If they had known of those untruths and omissions, they would not have purchased the GSE Certificates.

196.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market and shortly after issuance pursuant to the Prospectuses.

197.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

198.    The time period from June 2, 2009 through August 29, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and Citi, CGMI, CGMLT, Citibank NA, and CGMR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933
### (Against Defendants CGMR, Citi, and the Individual Defendants)

199.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

200.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against CGMR, Citi, and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

201.    The Individual Defendants at all relevant times participated in the operation and management of CGMLT and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of CGMLT's business affairs.  Defendant Susan Mills was the Vice President and the Managing Director of CGMLT.  Defendant Randall Costa was a President and Director of CGMLT.  Defendant Richard A. Isenberg was a President and Director of CGMLT.  Defendant Scott Freidenrich was a Treasurer and Principal Financial Officer of

CGMLT. Defendant Peter Patricola was a Controller of CGMLT.  Defendant Mark I. Tsesarsky

was a Director of CGMLT.  Defendant Jeffrey Perlowitz was a Director of CGMLT.  Defendant

Evelyn Echevarria was a Director of CGMLT.

202.     Defendant CGMR was the sponsor for the nine Securitizations carried out under

the four Registration Statements filed by CGMLT, and culpably participated in the violations of

Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by

initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the

structure of the Securitizations, selecting CGMLT as the special purpose vehicle, and selecting

CGMI as underwriter.  In its role as sponsor, CGMR knew and intended that the mortgage loans

it purchased would be sold in connection with the securitization process, and that certificates

representing the ownership interests of investors in the cash-flows from the mortgages would be

issued by the relevant trusts.

203.     Defendant CGMR also acted as the seller of the mortgage loans for the

Securitizations carried out under the four Registration Statements filed by CGMLT, in that it

conveyed such mortgage loans to CGMLT pursuant to an Assignment and Recognition

Agreement or a Mortgage Loan Purchase Agreement.

204.     Defendant CGMR also controlled all aspects of the business of CGMLT, as

CGMLT was merely a special purpose entity created for the purpose of acting as a pass-through

for the issuance of the Certificates.  Upon information and belief, the officers and directors of

CGMR overlapped with the officers and directors of CGMLT, such as Susan Mills, who was the

Vice President and Managing Director of CGMLT, as well as head of CGMI's Mortgage

Finance Group.  In addition, because of its position as sponsor, CMGR was able to, and did in

fact, control the contents of the four Registration Statements filed by CGMLT, including the

Prospectuses and Prospectus Supplements, which pertained to nine Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

205.    Defendant Citi controlled the business operations of CGMLT and CGMI. Defendant Citi is the corporate parent of CGMLT and CGMI.  As the sole corporate parent of CGMI and CGMLT, Citi had the practical ability to direct and control the actions of CGMI and CGMLT in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of CGMLT and CGMI in connection with the issuance and sale of the Certificates.

206.    Citi expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

207.    Citi culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as CGMLT and the issuing trusts to serve as conduits for the mortgage loans.

208.    Defendant Citi wholly owns CGMR, CGMI and CGMLT.  Citi culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as CGMLT and the issuing trusts to serve as conduits for the mortgage loans.

209.    Citi, CGMR, and the Individual Defendants are controlling persons within the

meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of CGMI and CGMLT at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

210.    Fannie Mae and Freddie Mac purchased in the primary market and shortly after issuance the GSE Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and were specifically material to Fannie Mae and Freddie Mac.

211.    Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements.  Had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

212.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

213.    The time period from June 2, 2009 through August 29, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and Citi, CGMI, CGMLT, Citibank NA, and CGMR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

**FOURTH CAUSE OF ACTION**

**Violation of Section 13.1-522(A)(ii) of the Virginia Code**
**(Against CGMI and CGMLT)**

214.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

215.   This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain to only those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

216.   This claim is predicated upon CGMI's negligence in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in paragraph 2 that CGMI sold.  Defendant CGMLT acted negligently in making materially false and misleading statements in the Prospectuses for the Securitizations effected under the four Shelf Registration Statements CGMLT filed, which are applicable to nine of the Securitizations.

217.   CGMI is prominently identified in the Prospectuses, the primary documents it used to sell the Certificates, except for CMLTI 2006-AR2.  CGMI offered the Certificates publicly, including selling to Freddie Mac its GSE Certificates as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

218.   CGMI offered and sold the GSE Certificates, except for CMLTI 2006-AR2, to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  CGMI reviewed and participated in drafting the Prospectuses.

219.    CGMI successfully solicited Freddie Mac's purchases of the GSE Certificates, except for CMLTI 2006-AR2.  As underwriter, CGMI obtained substantial commissions based on the amount it received from the sale of the Certificates to the public.

220.    CGMI offered the GSE Certificates for sale, sold them, and distributed them, except for CMLTI 2006-AR2, to Freddie Mac in the State of Virginia.

221.    CGMLT is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements it filed.  These Prospectuses were the primary documents CGMLT used to sell Certificates for the Securitizations under those Registration Statements.  CGMLT offered the Certificates publicly and actively solicited their sale, except for CMLTI 2006-AR2, including to Freddie Mac.

222.    With respect to the nine Securitizations for which it filed Registration Statements, including the related Prospectus Supplements, CGMLT offered the GSE Certificates, except for CMLTI 2006-AR2, to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, CGMLT reviewed and participated in drafting the Prospectuses.

223.    Each of CGMI and CGMLT actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, except for CMLTI 2006-AR2, and did so in order to benefit itself.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates, except for CMLTI 2006-AR2.

224.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted

were material to a reasonable investor reviewing the Prospectuses, and specifically to Freddie Mac.

225.    The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

226.    CGMI and CGMLT offered and sold the GSE Certificates, except for CMLTI 2006-AR2, pursuant to the Registration Statements directly to Freddie Mac, pursuant to the materially false, misleading, and incomplete Prospectuses.

227.    CGMI owed to Freddie Mac, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  CGMLT owed the same duty with respect to the Prospectuses for the Securitizations effected under the four Registration Statements filed by it.

228.    CGMI and CGMLT failed to exercise such reasonable care.  These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

229.    In contrast, Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Freddie Mac had known of those untruths and omissions, it would not have purchased the GSE Certificates.

230.    Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

231.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and  Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

### FIFTH CAUSE OF ACTION

**Violation of Section 13.1-522(C) of the Virginia Code**
**(Against CGMR, Citi, and the Individual Defendants)**

232.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

233.    This claim is brought by Plaintiff under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.  This claim is brought against CGMR, Citi, and the Individual Defendants for controlling-person liability with regard to the Fourth Cause of Action set forth above.

234.    The Individual Defendants at all relevant times participated in the operation and management of CGMLT and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of CGMLT's business affairs.  Defendant Susan Mills was the Vice President and Managing Director of Defendant CGMLT, and was also the head of CGMI's Mortgage Finance Group.  Defendant Richard A. Isenberg was a Director and President of Defendant CGMLT.  Defendant Randall Costa was a Director and President of Defendant CGMLT.  Defendant Scott Freidenrich was a Treasurer of Defendant CGMLT.  Defendant Mark

I. Tsesarsky was a Director of Defendant CGMLT.  Defendant Peter Patricola was a Controller of Defendant CGMLT.  Defendant Jeffrey Perlowitz was a Director of Defendant CGMLT. Defendant Evelyn Echevarria was a Director of Defendant CGMLT.

235.    Defendant CGMR was the sponsor for the nine Securitizations carried out under the four Registration Statements filed by CGMLT, and culpably participated in the violation of Section 13.1-522(A)(ii) set forth above with respect to the offering of GSE Certificates by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting CGMLT as the special purpose vehicle, and selecting CGMI as the lead underwriter.  In its role as sponsor, CGMR knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cash-flows would be issued by the relevant trusts.

236.    Defendant CGMR also acted as the seller of the mortgage loans for the Securitizations carried out under the four Registration Statements filed by CGMLT, in that it conveyed such mortgage loans to the CGMLT pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

237.    Defendant CGMR also controlled all aspects of the business of CGMLT, as CGMLT was merely a special purpose vehicle created to for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of CGMR overlapped with the officers and directors of CGMLT, such as Susan Mills, who was the Vice President and Managing Director of CGMLT, as well as head of CGMI's Mortgage Finance Group.  In addition, because of its position as sponsor, CGMR was able to, and did in fact, control the contents of the Registration Statements filed by CGMLT, including

the Prospectuses and Prospectus Supplements, which pertained to nine Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

238.     Defendant Citi controlled the business operations of CGMLT and CGMI. Defendant Citi is the corporate parent of CGMLT and CGMI.  As the sole corporate parent of CGMI and CGMLT, Citi had the practical ability to direct and control the actions of CGMI and CGMLT in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of CGMLT and CGMI in connection with the issuance and sale of the Certificates.

239.     Citi expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

240.     Defendant Citi wholly owns CGMR, CGMI and CGMLT.  Citi culpably participated in the violation of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as CGMLT and the issuing trusts to serve as conduits for the mortgage loans.

241.     Citi, CGMR, and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) of the Virginia Code by virtue of their actual power over, control of, ownership of, and/or directorship of CGMLT and CGMI at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

242.   Freddie Mac purchased the GSE Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and were specifically material to Freddie Mac.

243.   Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements.  Had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

244.   Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation, and for which CGMR, Citi, and the Individual Defendants are jointly and severally liable.

245.   This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION

### Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
### (Against CGMLT and CGMI)

246.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

247.   This claim is brought by Plaintiff pursuant to 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae with respect to the GSE Certificates identified in Table 11 above that were purchased by Fannie Mae, which were issued pursuant to the Registration Statements for the Securitizations, with the exception of CMLTI 2006-AR2.

248.    This claim is predicated upon CGMI's negligence in making materially false and misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in paragraph 2 that CGMI sold.  Defendant CGMLT acted negligently in making materially false and misleading statements in the Prospectuses for the Securitizations carried out under the four Registration Statements, which are applicable to nine of the Securitizations.

249.    CGMI is prominently identified in the Prospectuses, the primary documents it used to sell the Certificates, except for CMLTI 2006-AR2.  CGMI offered the Certificates publicly, including selling to Fannie Mae the GSE Certificates, except for CMLTI 2006-AR2, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

250.    CGMI offered and sold the GSE Certificates, except for CMLTI 2006-AR2, to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  CGMI reviewed and participated in drafting the Prospectuses.

251.    CGMI successfully solicited Fannie Mae's purchases of the GSE Certificates, except for CMLTI 2006-AR2.  As underwriter, CGMI obtained substantial commissions based on the amount it received from the sale of the Certificates to the public.

252.    CGMI offered the GSE Certificates for sale, sold them, and distributed them, except for CMLTI 2006-AR2, to Fannie Mae in the District of Columbia.

253.    CGMLT is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements it filed.  These Prospectuses were the primary documents CGMLT used to sell Certificates for the Securitizations under those Registration

Statements.  CGMLT offered the Certificates publicly and actively solicited their sale, except for CMLTI 2006-AR2, including to Fannie Mae.

254.    With respect to the nine Securitizations for which it filed Registration Statements, including the related Prospectus Supplements, CGMLT offered the GSE Certificates, except for CMLTI 2006-AR2, to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, CGMLT reviewed and participated in drafting the Prospectuses.

255.    Each of CGMI and CGMLT actively participated in the solicitation of the Fannie Mae's purchase of the GSE Certificates, except for CMLTI 2006-AR2, and did so in order to benefit itself.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates, except for CMLTI 2006-AR2.

256.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Fannie Mae.

257.    The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

258.    CGMI and CGMLT offered and sold the GSE Certificates, except for CMLTI 2006-AR2, pursuant to the Registration Statements directly to Fannie Mae pursuant to the

materially false, misleading, and incomplete Prospectuses.

259.    CGMI owed to Fannie Mae, as well as to other investors, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  CGMLT owed the same duty with respect to the Prospectuses for the Securitizations effected under the four Registration Statements filed by it.

260.    CGMI and CGMLT failed to exercise such reasonable care.  These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

261.    In contrast, Fannie Mae did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Fannie Mae had known of those untruths and omissions, it would not have purchased the GSE Certificates.

262.    Fannie Mae sustained substantial damages in connection with their investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

263.    The time period from June 2, 2009 through August 29, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and Citi, CGMI, CGMLT, Citibank NA, and CGMR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## SEVENTH CAUSE OF ACTION

### Violation of Section 31-5606.05(c) of the District of Columbia Code
### (Against CGMR, Citi, and the Individual Defendants)

264.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

265.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, that were purchased by Fannie Mae, with the exception of CMLTI 2006-AR2.  This claim is brought against CGMR, Citi, and the Individual Defendants for controlling-person liability with regard to the Sixth Cause of Action set forth above.

266.    The Individual Defendants at all relevant times participated in the operation and management of CGMLT and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of CGMLT's business affairs.  Defendant Susan Mills was the Vice President and Managing Director of Defendant CGMLT, and was also the head of CGMI's Mortgage Finance Group.  Defendant Richard A. Isenberg was a Director and President of Defendant CGMLT.  Defendant Randall Costa was a Director and President of Defendant CGMLT.  Defendant Scott Freidenrich was a Treasurer of Defendant CGMLT.  Defendant Mark I. Tsesarsky was a Director of Defendant CGMLT.  Defendant Peter Patricola was a Controller of Defendant CGMLT.  Defendant Jeffrey Perlowitz was a Director of Defendant CGMLT. Defendant Evelyn Echevarria was a Director of Defendant CGMLT.

267.    Defendant CGMR was the sponsor for the nine Securitizations carried out under the four Registration Statements filed by CGMLT, and culpably participated in the violation of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of GSE Certificates by

initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the

structure of the Securitizations, selecting CGMLT as the special purpose vehicle, and selecting

CGMI as the lead underwriter.  In its role as sponsor, CGMR knew and intended that the

mortgage loans it purchased would be sold in connection with the securitization process, and that

certificates representing the ownership interests of investors in the cash-flows would be issued

by the relevant trusts.

268.    Defendant CGMR also acted as the seller of the mortgage loans for the

Securitizations carried out under the four Registration Statements filed by CGMLT, in that it

conveyed such mortgage loans to the CGMLT pursuant to an Assignment and Recognition

Agreement or a Mortgage Loan Purchase Agreement.

269.    Defendant CGMR also controlled all aspects of the business of CGMLT, as

CGMLT was merely a special purpose vehicle created to for the purpose of acting as a pass-

through for the issuance of the Certificates.  Upon information and belief, the officers and

directors of CGMR overlapped with the officers and directors of CGMLT, such as Susan Mills,

who was the Vice President and Managing Director of CGMLT, as well as head of CGMI's

Mortgage Finance Group.  In addition, because of its position as sponsor, CGMR was able to,

and did in fact, control the contents of the Registration Statements filed by CGMLT, including

the Prospectuses and Prospectus Supplements, which pertained to nine Securitizations and which

contained material misstatements of fact and omitted facts necessary to make the facts stated

therein not misleading.

270.    Defendant Citi controlled the business operations of CGMLT and CGMI.

Defendant Citi is the corporate parent of CGMLT and CGMI.  As the sole corporate parent of

CGMI and CGMLIT,  Citi had the practical ability to direct and control the actions of CGMI and

CGMLT in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of CGMLT and CGMI in connection with the issuance and sale of the Certificates.

271.    Citi expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

272.    Defendant Citi wholly owns CGMR, CGMI and CGMLT.  Citi culpably participated in the violation of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as CGMLT and the issuing trusts to serve as conduits for the mortgage loans.

273.    Citi, CGMR, and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) of the District of Columbia Code by virtue of their actual power over, control of, ownership of, and/or directorship of CGMLT and CGMI at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

274.    Fannie Mae purchased the GSE Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Fannie Mae.

275.    Fannie Mae did not know, and in the exercise of reasonable diligence could not

have known, of the misstatements and omissions in the Registration Statements.  Had Fannie

Mae known of those misstatements and omissions, it would not have purchased the GSE

Certificates.

276.    Fannie Mae has sustained substantial damages as a result of the misstatements and

omissions in the Registration Statements, for which it is entitled to compensation, and for which

CGMR, Citi, and the Individual Defendants are jointly and severally liable.

277.    The time period from June 2, 2009 through August 29, 2011 has been tolled for

statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae

and Citi, CGMI, CGMLT, Citibank NA, and CGMR.  In addition, this action is brought within

three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie

Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

### EIGHTH CAUSE OF ACTION

**Common Law Negligent Misrepresentation**
**(Against Defendants CGMLT and CGMI)**

278.    Plaintiff realleges each allegation in paragraphs 1 through 164 above as if fully set

forth herein.

279.    This a claim for common law negligent misrepresentation against Defendants

CGMLT and CGMI.

280.    Between September 13, 2005 and May 31, 2007, CGMI and CGMLT sold the

GSE Certificates to the GSEs as described above.  Because CGMLT owned and then conveyed

the underlying mortgage loans that collateralized the Securitizations for which it served as

depositor, CGMLT had unique, exclusive, and special knowledge about the mortgage loans in

the Securitizations through its possession of the loan files and other documentation.

281.    Likewise, as lead underwriter of the Securitizations, CGMI was obligated to—and

had the opportunity to—perform sufficient due diligence to ensure that the Registration

Statements for those Securitizations, including without limitation the corresponding Prospectus

Supplements, did not contain an untrue statement of a material fact or omit to state a material

fact required to be stated therein or necessary to make the statements therein not misleading.  As

a result of this privileged position as underwriter—which gave it access to loan file information

and obligated it to perform adequate due diligence to ensure the accuracy of the Registration

Statements—CGMI had unique, exclusive, and special knowledge about the underlying

mortgage loans in the Securitizations.

282.    CGMI also had unique, exclusive, and special knowledge of the work of third-

party due diligence providers, such as Clayton, who identified significant failures of originators

to adhere to the underwriting standards represented in the Registration Statements.  The GSEs,

like other investors, had no access to borrower loan files prior to the closing of the

Securitizations and their purchase of the Certificates.  Accordingly, when determining whether to

purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the

servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis.  The

GSEs therefore reasonably relied on CGMI's knowledge and its express representations made

prior to the closing of the Securitizations regarding the underlying mortgage loans.

283.    CGMLT and CGMI were aware that the GSEs reasonably relied on CGMLT's

and CGMI's reputations and unique, exclusive, and special expertise and experience, as well as

their express representations made prior to the closing of the Securitizations, and that the GSEs

depended upon these Defendants for complete, accurate, and timely information.  The standards

under which the underlying mortgage loans were actually originated were known to these

Defendants and were not known, and could not be determined, by the GSEs prior to the closing

of the Securitizations.  In purchasing the GSE Certificates from CGMLT and CGMI, the GSEs

relied on their special relationship with those Defendants, and the purchases were made, in part,

in reliance on that relationship.

284.    Based upon their unique, exclusive, and special knowledge and expertise about

the loans held by the trusts in the Securitizations, CGMLT and CGMI had a duty to provide the

GSEs complete, accurate, and timely information regarding the mortgage loans and the

Securitizations.  CGMLT and CGMI breached their duty to provide such information to the

GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or

otherwise misrepresenting to the GSEs material facts about the Securitizations.  The

misrepresentations are set forth in Section IV above, and include misrepresentations as to the

accuracy of the represented credit ratings, compliance with underwriting guidelines for the

mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios

applicable to the Securitizations, as disclosed in the terms sheets and Prospectus Supplements.

285.    In addition, having made actual representations about the underlying collateral in

the Securitizations and the facts bearing on the riskiness of the Certificates, CGMLT and CGMI

had a duty to correct misimpressions left by their statements, including with respect to any "half

truths."  The GSEs were entitled to rely upon CGMLT and CGMI's representations about the

Securitizations, and these Defendants failed to correct in a timely manner any of their

misstatements or half truths, including misrepresentations as to compliance with underwriting

guidelines for the mortgage loans.

286.    Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the

representations by the Citi Defendants as the sponsors, depositors, and lead and selling

underwriters in all nine of the Citi-sponsored Securitizations.  The Citi Defendants provided term

sheets to the GSEs that contained critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics.  This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

287.    The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements.  In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by CGMR and CGMI relating to the collateral quality of the underlying loans and the structure of the Securitization.  These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

288.    The Citi Defendants, as sponsors, depositors, and lead and selling underwriters in all nine of the Citi-sponsored Securitizations, provided detailed information about the underlying collateral and structure of each Securitization it sponsored to the credit rating agencies.  The credit rating agencies based their ratings on the information provided to them by the Citi Defendants, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information.  The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of the Citi Defendants' representations in the term sheets and Prospectus Supplements.

289.    In addition, the GSEs relied on the fact that the originators of the mortgage loans

in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements.  Compliance with underwriting guidelines was a precondition to the GSEs' purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

290.     In purchasing the GSE Certificates, the GSEs justifiably relied on the Citi Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

291.     But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

292.     The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of CGMLT's and CGMI's misrepresentations, including any half truths.

293.     The time period from June 2, 2009 through August 29, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and Citi, CGMI, CGMLT, Citibank NA, and CGMR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

294.     An award in favor of Plaintiff against all Defendants, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

   a.  Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

   b.  Each GSE's monetary losses, including any diminution in value of the GSE Certificates, as well as lost principal and lost interest payments thereon;

   c.  Attorneys' fees and costs;

   d.  Prejudgment interest at the maximum legal rate; and

   e.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

295. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:   New York, New York
         September 2, 2011

                            QUINN EMANUEL URQUHART &
                               SULLIVAN, LLP


                            By: _____
                               Philippe Z. Selendy
                               Manisha M. Sheth

                            51 Madison Avenue, 22nd Floor
                            New York, New York  10010-1601
                            (212) 849-7000

                            *Attorneys for Plaintiff Federal Housing
                            Finance Agency*